# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | : | |
|---|---|---|
| **IN RE: D. ERIK VON KIEL,** | : | |
| | : | |
| **D. ERIK VON KIEL,** | : | **CIVIL ACTION NO. 12-972** |
| **Appellant,** | : | |
| | : | |
| v. | : | **BANKRUPTCY NO. 10-21364** |
| | : | |
| **UNITED STATES TRUSTEE,** | : | |
| **Appellee.** | : | |

## MEMORANDUM OPINION

**RUFE, J.**                                                                                              **FEBRUARY 6, 2013**

Debtor-Appellant, D. Erik von Kiel, appeals *pro se* from the Bankruptcy Court's order dated January 5, 2012. For the following reasons, and having considered fully the briefs and the record on appeal, and having determined that oral argument is not necessary in this case,[1] the Court will affirm the order of the Bankruptcy Court.

## I. BACKGROUND

On May 6, 2010, Debtor filed a voluntary bankruptcy petition under Chapter 7 of the United States Bankruptcy Code[2] in the Bankruptcy Court for the Eastern District of Pennsylvania.[3] On October 13, 2010, the United States Trustee timely filed a complaint, objecting to discharge on three independent statutory grounds: "[Debtor], with intent to hinder, delay or defraud, concealed property and made pre- and/or post-petition transfers thereof"[4] (Count 1); "[Debtor] failed to keep or preserve recorded information from which his financial

---

[1] Fed. R. Bankr. P. 8012.

[2] 11 U.S.C. §§ 701-784.

[3] Bankr. E.D. Pa. Pet. No. 10-21364, Doc. No. 1.

[4] Bankr. E.D. Pa. Adversary Proceeding No. 10-2136, Doc. No. 1 at 4 (citing 11 U.S.C. § 727(a)(2)).

condition or business transactions might be ascertained"[5] (Count 2); and "[Debtor] knowingly and fraudulently, in or in connection with this case, made a false oath or account"[6] (Count 3). The Bankruptcy Court tried the matter on July 29 and August 8, 2011.[7] A finding in the Trustee's favor on any individual count would have provided a basis for denying the Debtor's discharge. On January 5, 2012, the Bankruptcy Court entered judgment denying Debtor's discharge on each of the three grounds.[8] This appeal followed.

## II. JURISDICTIONAL STATEMENT

Bankruptcy courts have jurisdiction to hear and determine all core proceedings under Title 11 of the United States Code.[9] An adversary proceeding seeking denial of a debtor's discharge pursuant to 11 U.S.C. § 727 is a core proceeding under 28 U.S.C. § 157(b)(2)(J); therefore, the Bankruptcy Court had jurisdiction under this section to consider the United States Trustee's objection to Debtor's discharge.

By Opinion and Order dated January 5, 2012, the Bankruptcy Court entered final judgment denying Debtor's discharge.[10] On January 23, 2012, after the time for filing a notice of appeal ran, Debtor filed a notice of appeal together with a motion for an extension of time to file the appeal.[11] The Bankruptcy Court denied the motion for an extension on February 13, 2012.[12]

---

[5] Id. at 5 (citing 11 U.S.C. § 727(a)(3)).

[6] Id. at 6 (citing 11 U.S.C. § 727(a)(4)).

[7] Bankr. No. 10-2136, Doc. No. 18, 19.

[8] Bankr. No. 10-2136, Doc. No. 33.

[9] 28 U.S.C. §§ 157(b)(1) and (b)(2).

[10] Bankr. No. 10-2136, Doc. No. 33.

[11] Bankr. No. 10-2136, Doc. Nos. 35, 36; see 28 U.S.C. § 158(c)(2); Fed. R. Bankr. Proc. 8002.

[12] Bankr. No. 10-2136, Doc. No. 44.

Debtor thereafter filed a motion for reconsideration and on March 20, 2012, after a hearing, the Bankruptcy Court granted the motion to reconsider and extended the time to file an appeal.[13] Debtor's appeal to this Court is therefore timely, and this Court has jurisdiction to review the Bankruptcy Court's decision pursuant to 28 U.S.C. § 158(a).[14]

### III. STANDARD OF REVIEW

A district court reviewing the decision of a bankruptcy court on appeal reviews the bankruptcy court's "legal determinations *de novo*, its factual findings for clear error, and its exercise of discretion for abuse thereof."[15] A "bankruptcy court's ultimate determination [to deny discharge under § 727] should be affirmed absent an abuse of discretion."[16] "A bankruptcy court abuses its discretion when its ruling is founded on an error of law or a misapplication of law to the facts."[17]

A district court's review of a bankruptcy appeal is limited to the record before the bankruptcy court.[18] Debtor, who did not introduce any exhibits at trial, attempts to introduce in this appeal pleadings and other documents that were not before the Bankruptcy Court. The Court

---

[13] Bankr. No. 10-2136, Doc. Nos. 47, 53, 54.

[14] In re Michael, 699 F.3d 305, 308 n.2 (3d Cir. 2012).

[15] In re O'Brien Envtl. Energy, Inc., 188 F.3d 116, 122 (3d Cir. 1999).

[16] Meridian Bank v. Alten, 958 F.2d 1226, 1230 n.2 (3d Cir. 1992) ("Assuming a bankruptcy court correctly applie[s] the proper legal precepts when making its [§] 727[] determination, and that the court's basic and inferred factual findings were not clearly erroneous, the bankruptcy court's ultimate determination should be affirmed absent an abuse of discretion.").

[17] Stonington Partners, Inc. v. Lernout & Hauspie Speech Prods., 310 F.3d 118, 122 (3d Cir. 2002) (quoting In re O'Brien Envtl. Energy, Inc., 188 F.3d at 122) (internal quotation marks omitted). Debtor mistakenly relies on the summary judgment standard. See Doc. No. 6 at 22 (citing Rosen v. Bezner, 996 F.2d 1527 (3d Cir. 1993)). This standard is not applicable here.

[18] In re Stone Res., Inc, 482 F. App'x 719, 722-23 (3d Cir. 2012) (citing Nantucket Investors II v. Cal. Fed. Bank, 61 F.3d 197, 210 n.19 (3d Cir. 1995)).

does not consider these documents in reaching its decision as it is not this Court's role to engage in independent fact finding.[19]

## IV.  STATEMENT OF FACTS

Generally, Debtor does not take issue with the Bankruptcy Court's factual findings; instead, he disputes the Bankruptcy Court's conclusion with respect to his credibility and his intent in conducting his financial affairs.  Deferring to the Bankruptcy Court's credibility determinations, this Court has reviewed the Bankruptcy Court's factual findings for clear error and finds none.  The following facts are taken from the Bankruptcy Court's January 5, 2012 Opinion denying Debtor's discharge.  Since the Court writes primarily for the parties who are familiar with the facts at issue, the Court recounts herein only those facts necessary to give context to its decision.[20]

> Debtor earns compensation well in excess of $150,000 annually.  Debtor earns such compensation, but he has declined and continues to decline to take it and has assigned and continues to assign it to an apparent religious organization that gave and gives back to him, as a gift, a substantial portion of that compensation. For ten years before filing his bankruptcy case, Debtor has been evading taxes and shielding his assets and income from creditors. Under the label of a ministry, Debtor has avoided and evaded his obligation to report his income and file tax returns. He has also kept his assets and income beyond the reach of his creditors, including the United States, to which is owed significant unpaid student loans and probable unpaid taxes. Electing a shield of poverty and maintaining some separation from his family, Debtor exercised complete control over substantial amounts of money by using tax identification numbers that were not his, opening bank accounts (that he controlled) in the names of different entities, and funneling income through a nominally religious entity - all to defraud tax authorities and frustrate his creditors.[21]

---

[19]  Id.

[20]  See In re Myers, 491 F.3d 120, 126 (3d Cir. 2007) ("The Bankruptcy Court is best positioned to assess the facts, particularly those related to credibility and purpose.").

[21]  Bankr. No. 10-2136, Doc. No. 33 at 1-2.

4

Debtor graduated from Philadelphia College of Osteopathic Medicine with a medical degree in 1985. He used Health Education Assistance Loans ("HEAL") to pay for his education and since completing his residency in 1988, has continually practiced medicine. Despite his continued employment, Debtor claims that he has no actual or beneficial interest in any real property, bank accounts, or other assets and receives no income.

The Bankruptcy Court summarized Debtor's "unusual lifestyle" as follows:

> Debtor's unusual lifestyle and financial dealings began after his alleged spiritual awakening upon being charged with Medicare fraud in 1997. Although he was cleared of the charges, he claims this experience caused him to reevaluate his circumstances and make dramatic changes in his life. Among other changes, Debtor ended his practice of family medicine and any practice involving insurance billing. He now concentrates on non-traditional medical treatments, such as lymphology, and he works full time providing medical services to prison inmates.[22]

Debtor has been employed for ten years as a "Minister/M.D./D.O." with the International Academy of Life ("IAL") based in Orem, Utah; he claims that he receives no salary or wages from his employer. In 2001, Debtor joined the IAL and took a vow of poverty, which required that he renounce any interest in real or personal property, and current and future income, granting all such interests to IAL.[23] To this end, he established at least one trust in an attempt to transfer ownership of the home he owned jointly with his wife, and granted powers of attorney to John Kusek and Robert macWray, to whom he gave full authority to handle all of his financial affairs. Thereafter, Debtor claims that he had no involvement in his financial affairs (with the exception of writing checks for his needs and those of his family) and keeps no records of his financial dealings.

---

[22] Id. at 6.

[23] In his briefs, Debtor disputes any suggestion by the Bankruptcy Court that his religious transformation was in any way related to his civil liability or that his vow of poverty was motivated by a desire to conceal assets. The Court defers to the Bankruptcy Court's factual findings regarding the timing of the events stated above, timing which Debtor does not claim is inaccurate. To the extent the timing of these events suggests improper motive, the Court will discuss the Bankruptcy Court's findings below and will defer to them.

Beginning in 1989, and continuing at least through Debtor's bankruptcy trial, Debtor has provided medical services to inmates at the Lehigh County Prison ("LCP"), where he currently holds the title of Medical Director. In this capacity, he is a full-time employee of PrimeCare Medical, Inc., which contracted with Lehigh County to provide medical services at county correctional facilities, including LCP.[24] The Bankruptcy Court found that PrimeCare does not have a contractual relationship with IAL and that IAL does not supervise or exercise any control over Debtor's employment at PrimeCare.[25]

In 2004, Debtor completed and signed Internal Revenue Service Form W-9 for tax purposes. Rather than complying with the instructions and placing his social security number on the form, Debtor completed the form using another social security number, one that did not belong to him and instead was supplied by IAL. PrimeCare issued a W-2 to Debtor each year listing the social security number supplied by IAL and stating the amount of compensation he earned that year. Debtor did not pay taxes on his yearly PrimeCare income of more than $150,000.

According to Debtor, he receives "gifts" of $12,787 per month, from which no taxes are other deductions are taken. Debtor maintains that he retains little of this "gift" money, stating that he pays $12,000 per month to support his estranged wife and nine children, some of whom are adults and at least two of whom were born after the couple's separation. These support payments are made voluntarily, not pursuant to any court order or other written agreement between Debtor and his wife. The Bankruptcy Court characterized some of the expenses Debtor

---

[24] Debtor is an independent contractor, employed by PrimeCare to provide medical services at LCP/ PrimeCare began providing medical services for LCP in 2004. Prior to this time, Wexford Health Services provided medical services at LCP and Debtor was employed as an independent contractor for Wexford since 2001. From 1989 until 2001, Debtor worked as an independent contractor unaffiliated with any corporate entity.

[25] Bankr. No. 10-2136, Doc. No. 33 at 7.

6

claims to pay for his wife and children as "extraordinary." After paying $12,000 to his family, Debtor claims that he has less than $1,000 each month to pay his own living expenses.

In 1999 and 2000, two civil judgments totaling about $187,000, had been entered against Debtor in the Lehigh County Court of Common Pleas. The judgments arose from defaulted payments to the Department of Health and Human Services ("HHS"), on Debtor's HEAL loans, and were registered under Debtor's alias (D.O. Dennis W. Fluck) in the United States District Court for the Eastern District of Pennsylvania on September 19, 2002.[26]

The United States began collection efforts in 2006, applying for and obtaining writs of garnishment from PrimeCare. Around the beginning of these garnishment proceedings, Debtor engaged in a series of actions which the Bankruptcy Court found were designed to keep Debtor's assets and income beyond the reach of his creditors, including the United States. On June 1, 2006, or example, Debtor signed a deed transferring sole ownership of his home to his estranged wife. He also signed two different "Employee Direct Deposit Authorization Forms."[27] Both forms directed that PrimeCare deposit Debtor's paycheck into an account maintained by IAL Management, LLC ("IAL account"); however, one was completed using Debtor's social security number, while the other was completed using the second social security number that IAL had provided to Debtor.

In December 2006, Debtor opened a business checking and investment accounts in the name of "True Life Ministries, Inc." or "TLM", naming himself as trustee. Debtor used a third tax identification number to open these accounts.[28] Though Debtor claimed to be ignorant of the

---

[26] Misc. No. 02-234, Doc. No. 1 (Hon. Petrese B. Tucker, presiding).

[27] Bankr. No. 10-2136, Doc. No. 33 at 9-10.

[28] Id. at 10.

fact that he was named as trustee on the TLM accounts, the Bankruptcy Court found that Debtor's claimed ignorance

> was a frequent and pervasive characteristic of Debtor's testimony and conduct throughout this entire case. Debtor blindly followed the direction and advice of IAL, its representatives, and Mr. Kusek regarding all things legal and financial. He made no effort to ascertain the legitimacy of anything that he did at their direction. He simply followed their orders and direction on how he should conduct his affairs with no evinced concern for its legality or propriety.[29]

Further, despite Debtor's insistence that he had no affiliation with TLM other than being permitted to use the accounts, the address given for the TLM accounts is Debtor's personal address, the TLM accounts were in his sole and exclusive control,[30] and the TLM account funds were used to pay the expenses of Debtor and his family.

In July 2007, PrimeCare began depositing Debtor's pay directly into the IAL account; IAL would then transfer money in amounts similar to Debtor's paychecks into the TLM account.[31] Notwithstanding Debtor's receipt of W-2s from PrimeCare and his salary of more than $150,000 per year, Debtor insisted in his testimony before the Bankruptcy Court that he receives no income for his work for PrimeCare. Rather, he claims that his salary belonged to IAL, and that since 2001 he worked "voluntarily in his capacity as a minister and medical missionary of IAL, pursuant to specific directive of the church."[32]

---

[29] Id.

[30] Debtor was the only individual with signatory authority on the accounts, and he was the only person with custody and control of the debit cards linked to the accounts.

[31] As the Bankruptcy Court explained: "The amount wired into the TLM accounts was determined by IAL officials in consultation with Mr. Kusek, and were based on Debtor's family, personal, and ministry needs each month. Mr. Kusek prepared monthly expense requests and Debtor played no part in determining the amounts requested. Debtor did not ask for and did not keep copies of the expense requests. Although Mr. Kusek was neither affiliated with IAL nor subject to supervision by its officials, Debtor granted Mr. Kusek a power of attorney. The power of attorney allowed Mr. Kusek to oversee Debtor's financial activities, including the TLM accounts, allegedly to ensure that he acted responsibly in requesting funds. Mr. Kusek's oversight activities apparently decreased over time." Bankr. No. 10-2136, Doc. No. 33 at 11-12.

8

"On April 23, 2010, only two weeks before Debtor filed [his bankruptcy petition], Judge Tucker rejected Debtor's attempt to challenge the judgments and the garnishment efforts of the United States and ordered Debtor's employer to pay 25% of Debtor's net earnings to the United States for his HEAL loans."[33] The Bankruptcy Court found that Debtor's bankruptcy petition "constitutes Debtor's ill-concealed and back-door attempt to avoid Judge Tucker's decision," and the reach of his creditors in general.[34]

## V. DEBTOR'S APPEAL

As stated, the Bankruptcy Court denied Debtor's discharge on three separate and independent statutory grounds---11 U.S.C. §§ 727(a)(2), 727(a)(3), and 727(a)(4). Debtor appeals, arguing that the Bankruptcy Court's decision "cannot be sustained on violations of sections 727(a)(2)(A) or 727(a)(4) or 727(a)(3) of the bankruptcy code."[35] This Court, however, will affirm the denial of discharge under § 727(a)(2) based on its conclusion that the record supports the Bankruptcy Court's finding that Debtor engaged in a fraudulent scheme to evade taxes and frustrate his creditors. Since the Court finds that the Bankruptcy Court's denial of Debtor's discharge pursuant to § 727(a)(2) is supported by the record, is legally sufficient, and provides a sufficient independent statutory basis for denial of discharge, the Court will not address the two other statutory grounds that the Bankruptcy Court found justified discharge in this case.

Title 11, United States Code, § 727(a)(2) "provides that a debtor shall be denied a discharge where he: 'with intent to hinder, delay or defraud a creditor or an officer of the estate

---

[32] Bankr. No. 10-2136, Doc. No. 33 at 12.

[33] Id. at 5.

[34] Id.

[35] Doc. No. 6.

9

charged with the custody of property under this title, has transferred, removed, destroyed, mutilated or concealed, or has permitted to be transferred, removed, destroyed, mutilated or concealed- (A) property of the debtor, within one year before the date of the filing of the petition.'"[36] A court's primary inquiry under this section "is whether [debtor] intended to hinder or delay a creditor. If he did, he had the intent penalized by the statute notwithstanding any other motivation he may have had for the transfer."[37] A denial of discharge under § 727(a)(2) is warranted upon a finding:

> 1. that the act complained of was done at a time subsequent to one year before the filing of the petition or after the date of the filing of the petition;
>
> 2. with intent to hinder, delay, or defraud a creditor of the property under the Bankruptcy Code;
>
> 3. that the act was that of the debtor or his duly authorized agent; and
>
> 4. that the act consisted of transferring, removing, destroying or concealing any of the debtor's property.[38]

Given that a debtor is unlikely to admit that his acts were in fact intended to hinder creditors or fraudulent, courts have identified "badges of fraud" the existence of which indicates fraudulent intent. These "badges" include:

> (1) a close relationship between a transferor and transferee; (2) a transfer in anticipation of a pending lawsuit; (3) a transferor/debtor who was insolvent or in poor financial condition at the time of the transfer; (4) the transfer of all or substantially all of the debtor's property; (5) a transfer that so completely depletes the debtor's assets that the creditor was hindered or delayed in

---

[36] In re DiLoreto, 266 F. App'x 140, 143-44 (3d Cir. 2008) (quoting 11 U.S.C. § 727(a)(2)) (emphasis added).

[37] In re Blatstein, 192 F.3d 88, 97 (3d Cir. 1999) (quoting In re Adeeb, 787 F.2d 1339, 1343 (9th Cir. 2009) (quotation marks omitted) (alteration in original)).

[38] In re Singh, 433 B.R. 139, 160 (Bankr. E.D. Pa. 2010).

10

recovering any part of the judgment; and (6) the shifting of assets by the debtor to a corporation wholly controlled by him."[39]

Here, the record clearly supports the Bankruptcy Court's finding that Debtor concealed property belonging to, or at the very least controlled by him with the intent to hinder his creditors. Despite his income of more than $150,000, his receipt of W-2s, his control over the TLM account to which most of the $150,000 income was transferred, and the fact that this income, or an equivalent sum of money, was used to pay Debtor's personal and family expenses, Debtor maintained that he has little to no income or assets. Debtor's claimed that the income he earned from PrimeCare was not his property is belied by his actions, which show attempts to conceal income and assets, and to move his property beyond the reach of his creditors.

The Court notes factual evidence of a close relationship between Debtor and IAL and the Debtor and TLM, the use of a second social security number, Debtor's arranging for his income to be passed through more than one account though ultimately the funds were used by Debtor, Debtor's attempt to transfer the home he owned jointly with his estranged wife to her sole ownership, Debtor's attempt to disclaim knowledge of his financial affairs by using a power of attorney and failing to keep records of his transactions, and Debtor's receipt and use of $13,000 in "gift" money from IAL every month to pay personal and family expenses. The Bankruptcy Court did not find Debtor and his "ignorance" credible and this Court defers to this credibility determination, which is supported by other facts of record.

Although his arguments are not clearly defined, it appears that Debtor believes that the Bankruptcy Court's ruling pursuant to § 727(a)(2) should be overturned (1) because the Government was aware that PrimeCare was Debtor's employer and has not determined that he is

---

[39] See Bankr. No. 10-2136, Doc. No. 33 at 31-32 (quoting In re Corona, No. 00-15924, 2010 WL 1382122, at *13 (D.N.J. Apr. 5, 2010)).

liable for any taxes on the $150,000 he earned at LCP, and (2) because he relinquished all of his income and assets to IAL, he could not have concealed any income or assets, but even if the "gifts" should have been disclosed, he used the money for a proper purpose. With respect to Debtor's first argument, whether Defendant is required to pay taxes on his earnings and the Government's knowledge of Debtor's employer is irrelevant to the issue of Debtor's concealing assets with intent to defraud. With respect to Debtor's second argument, the Bankruptcy Court found that despite Debtor's insistence that he retained no interest in the income he earned, Debtor had an undisclosed interest in the accounts where the money was deposited and the earnings were used to pay Debtor's personal and family expenses. Debtor's use of these earnings to pay for legitimate living expenses is irrelevant.

## V. CONCLUSION

For the foregoing reasons, the Court finds that the Bankruptcy Court did not abuse its discretion when it denied Debtor's discharge pursuant to 11 U.S.C. § 727(a)(2). Accordingly, the Court will affirm the January 5, 2012 Order of the Bankruptcy Court.

An order will be entered.